**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| CYNTHIA DYCHES LINTHICUM and CHRISTOPHER MARTIN LINTHICUM, Natural Parents of TRISTAN A. LINTHICUM, Deceased, as Assignees of BOBBY JAMES HOPKINS, II, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. CV415-023 |
| v. | ) ) | |
| MENDAKOTA INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) | |

## ORDER

Before the Court are the plaintiffs' motions to compel defendant's discovery responses. Docs. 18 & 19. Defendant opposes. Docs. 20 & 27.

## I. BACKGROUND

While insured by defendant Mendakota Insurance Company ("Mendakota"), Bobby Hopkins struck and killed Tristan Linthicum with his car on June 3, 2008. Mendakota was obligated

to cover Hopkins' undisputed liability but, Tristan's parents now

claim, it in bad faith refused to settle with them for Hopkins'

$25,000 policy limits. Doc. 18 at 1-4. They later obtained -- with

Mendakota's cooperation -- a $1.2 million "settlement judgment"

against Hopkins. *Id.* at 4; doc. 20 at 6 (Mendakota "agreed to a

stipulated judgment so that its insured (and Plaintiffs) could avoid

a trial [in the underlying case] and the case could proceed to the

real issue: whether Mendakota acted in 'bad faith. . . .'").

The legal mechanics of a "bad faith" claim inform the

background facts here, and thus the relevancy considerations

needed to resolve the discovery motions:

> Under Georgia law, "[a]n insurance company may be liable
> for the excess judgment entered against its insured based on
> the insurer's bad faith or negligent refusal to settle a personal
> claim within the policy limits." *Cotton States Mut. Inc. Co. v.
> Brightman*, 580 S.E.2d 519, 521 (Ga. 2003). An insured may
> establish a claim against its insurance company for bad faith
> failure-to-settle where "the insurer acted unreasonably in
> declining to accept a time-limited settlement offer." *South.
> Gen. Ins. Co. v. Holt*, 416 S.E.2d 274, 276 (Ga. 1992).

*Owners Ins. Co. v. Parsons*, 2015 WL 2388393 at * 2 (11th Cir.

May 20, 2015). However,

> an insurer will be exposed to a judgment in excess of its
> policy limits only where there is some certainty regarding

the settlement posture of the parties in the underlying lawsuit -- *i.e.*, where the insured's liability is clear, the damages are great and the insurer is on notice that it has an opportunity to settle the case, usually because a settlement demand in the amount of the policy limits or greater is received from the plaintiff. There must be a triggering event -- something that puts the insurer on notice that it must respond or risk liability for an excess judgment. Put another way, to find liability for tortious refusal to settle there must be something the insurer was required to "refuse."

*Kingsley v. State Farm Mut. Auto. Ins. Co.*, 353 F. Supp. 2d 1242, 1252-53 (N.D. Ga. 2005); *see also id.* (the plaintiff's "secret" deadline deprived insurer of notice of an opportunity to settle within the policy limits required under Georgia law as a predicate to liability), *aff'd*, 153 F. App'x 555 (11th Cir. 2005); *see also Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1550 (11th Cir. 1991) ("At a minimum . . . Georgia law mandates that the insured show that settlement was possible -- the case could have been settled within the policy limits -- and that the insurer knew, or reasonably should have known, of this fact.").

Hopkins assigned his *"Holt"* claim to the Linthicums, who sue Mendakota here and move to compel it to produce its entire claims file on the underlying lawsuit, plus answer interrogatories.

3

Doc. 18 at 5; doc. 19. Specifically, they want a "cover-to-cover" copy of Mendakota's "entire claims file," doc. 18 at 5, "from the inception of the claim to January 23, 2013, the date of the [$1.2 million] judgment," *id.*, and "the claims file post-dating June 16[, 2010]." *Id.* at 8. Their interrogatories seek the identity of all involved in the claims-adjustment process who likely have discoverable information. Doc. 19 at 5-9. Mendakota objects to some of that discovery on relevancy, work-product, and attorney-client privilege grounds.[1] Doc. 20.

There is no dispute that the accident occurred on June 3, 2008 and that Mendakota's policy covered Hopkins. Doc. 20 at 1. And Mendakota concedes that it failed to respond to plaintiffs' May 12, 2010 "policy limits" demand letter by the May 24, 2010 deadline that their counsel set. Doc. 19 at 3-4; doc. 20 at 1-2; *see also id.* at 2 n. 1. But Mendakota also says that it had repeatedly offered to

---

[1] Plaintiffs clarify that they seek no "communications between Mendakota and its attorneys in *this* bad faith action." Doc. 18 at 19 (emphasis added). But "to the extent Mendakota has statements, reports and evaluations prepared by anyone other than counsel of record in this case, Mendakota has failed to fulfill its burden of showing that any privilege applies to such documents and they must be produced." *Id.* at 19-20.

settle for the $25,000 policy limits *before* that date, yet plaintiffs refused. Doc. 20 at 2. It shows (and plaintiffs do not dispute) that,

> on July 15, 2008, their attorney, Tom Bordeaux, sent a letter to Mendakota's adjuster, Kate Moulton, advising Mendakota that he represented Plaintiffs in their claim for wrongful death against Hopkins. But [in their motion to compel filing] Plaintiffs omit that just ten days later, on July 25, 2008, Moulton and Bordeaux had a telephone conversation in which Moulton told Bordeaux that Mendakota was tendering its full policy limits to resolve Plaintiffs' claim. Plaintiffs also fail to mention that, in response to Moulton's phone call, Bordeaux said that he had "other avenues to pursue," and that he was not yet ready to accept Mendakota's policy limits. Nor do Plaintiffs mention that, on October 8, 2008, in another call between Bordeaux and Moulton, Bordeaux said that Plaintiffs would sign a limited release. Importantly, Bordeaux also asked Moulton to send him a release "for his review/update."
>
> The next day, Moulton sent a letter to Bordeaux, which again stated that Mendakota was tendering its policy limits "to settle the case of Cynthia and Christopher Linthicum, natural parents of Tristan A. Linthicum, a minor, deceased." As requested by Bordeaux, Moulton forwarded a proposed release for his review. In the letter, Moulton *mistakenly* suggested that Mendakota would have to issue payment to the Estate of Tristan A. Linthicum. Moulton also requested a copy of Tristan Linthicum's death certificate. According to Plaintiffs, "[t]he Linthicums did not accept Mendakota's offer."

Doc. 20 at 4 (record cites omitted; emphasis added).

Mendakota's unrebutted factual showing directly affects the strength of plaintiffs' *Holt* (bad faith) claim against it. That, in

turn, informs the relevancy determination[2] required to resolve this

discovery dispute. Hence, closer scrutiny of Mendakota's claims-

handling is warranted. Its recitation about what happened next

also is unrebutted:

> Plaintiffs' Statement of Facts then skips ahead to May 12, 2010 -- as if Moulton and Mendakota simply ignored the claim for 18 months. That is simply not true. Bordeaux responded to Moulton's letter tendering policy limits on October 15, 2008. Bordeaux provided a certified copy of Tristan's death certificate, which Moulton had requested, and stated: "I hope to be able to proceed with these files in the near future." Notably, Bordeaux *did not object* to the proposed release, reject Mendakota's] tender of policy limits, or object to Moulton's statement that the settlement check would have to be issued to the estate. Moulton *then did not hear from Bordeaux for several months*. On January 21, 2009, Moulton contacted Bordeaux regarding the status of settlement. Bordeaux told her that the case was "on hold" pending the criminal prosecution of Bobby Hopkins.
>
> Plaintiffs [in their moving brief] also omit that Moulton left at least four telephone messages for Bordeaux between January and August 2009, *but none of them were returned.*

---

[2] *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). And relevance is a broad concept, encompassing "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Healthcare Servs. Grp., Inc. v. Lower Oconee Cmty. Hosp.*, 2014 WL 4385714 at * 1 (S.D. Ga. Sept. 3, 2014) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)); *Robbins v. Owners Ins. Co.*, 2015 WL 3910920 at * 1 n. 3 (S.D. Ga. June 24, 2015).

Finally, on August 27, 2009, Moulton spoke with Bordeaux's assistant, who advised that Bordeaux would not conclude the settlement until *after the criminal case was completed.* Moulton again followed up on December 4, 2009, and Bordeaux's assistant advised her that the criminal trial had been "pushed out further."

Doc. 20 at 5 (record cites omitted; emphasis added).

It is telling that, in moving for discovery of Mendakota's claims file and insisting that it is "highly relevant" to their bad faith claim -- hence, plaintiffs pursue evidence to show just how blasé Mendakota behaved -- plaintiffs would *omit* such critical material facts from their factual presentation to this Court. Alas, there's more (again, this goes unrebutted):

On May 12, 2010, Bordeaux sent a letter to Moulton demanding Mendakota policy limits of $25,000 (which Mendakota had already tendered numerous times), stating that the offer would expire at 5 pm on May 24, 2010 -- just eight business days later. On June 2, 2010, Plaintiffs filed the underlying suit against Hopkins. On June 15, 2010, Moulton spoke to Bordeaux's assistant and reminded her that Mendakota had previously offered its policy limits to resolve the case. Moulton also sent a letter to Bordeaux that same day, reminding him of the October 9, 2008, tender of policy limits, and asking Bordeaux to contact her to discuss.

Bordeaux did not contact Moulton to discuss. Instead, he wrote back the next day, claiming that Plaintiffs never accepted Mendakota's offer of October 8, 2008, and that Mendakota never accepted Bordeaux's demand of May 12,

2010. Bordeaux also made clear that his May 12 demand had now expired.

Doc. 20 at 5-6 (record cites and footnote omitted).

Given the parties' failure to settle -- which Mendakota ascribes to Bordeaux's stall tactics -- Mendakota reasons that "anything that may have subsequently taken place in the underlying lawsuit filed against Mr. Hopkins is neither relevant here nor reasonably calculated to lead to the discovery of admissible evidence." Doc. 20 at 2. It represents that the "statements, reports, and evaluations," as well as "claim committee documents" that plaintiffs seek "do not exist outside of the claim file. Thus, any such documents generated *prior to June 16, 2010,* have been produced." *Id.* at 9 n. 4 (emphasis added).[3]

---

[3] Elsewhere, it represents that it

> has produced its *complete* claims file from the date the file was opened on June 10, 2008, through the date that Plaintiffs' counsel advised Mendakota that the settlement offer was withdrawn, and even included some claim entries after Mendakota proceeded to defend the underlying lawsuits. While Mendakota did withhold communications with defense counsel based on the attorney-client privilege and irrelevant communications concerning the claim asserted by Dylan Linthicum, no other documents were withheld.

Doc. 20 at 10.

But the briefs get a tad confusing about negotiation cut-off dates. Obviously people sometimes talk after the date of a letter, and Mendakota's "date-variability" in the briefs reflects this. Mendakota initially insisted that the "there were no negotiations (*i.e.*, no demands, and thus no refusals to settle) after June 16, 2010." Doc. 20 at 9. Since no relevant conduct occurred after that date, it concluded, nothing in its claim file is now discoverable from that point onward. *Id.* It thus asked the Court to deny plaintiffs' motion to compel. *Id.* at 10; *see also id.* at 16 ("However, even if Mendakota had somehow acted in bad faith, the bad faith could not have occurred after negotiations ceased *on June 16, 2010.*") (emphasis added).

To that end, Mendakota (in a later brief[4]) highlights plaintiffs' admission, made in their interrogatory responses, that

---

[4]    Mendakota moves for leave to file it, doc. 27, evidently unaware of this Court's unlimited reply brief policy. *See Waddy v. Globus Medical, Inc.*, 2008 WL 3861994 (S.D.Ga. Aug 18, 2008) (the "parties may file as many reply briefs as they like under Local Rule 7.5.") (citing *Podger v. Gulfstream Aerospace Corp.*, 212 F.R.D. 609, 609 (S.D. Ga. 2003)); *see also* S.D.GA.L.R. 7.6 (authorizing reply briefs but imposing notice requirements and time limits); *Brown v. Chertoff*, 2008 WL 5190638 at *1 (S.D. Ga. Dec. 10, 2008) (reminding that "[o]nce the initial round of briefs have been filed, subsequent replies run the risk of 'sudden death.' That is, the Court is free to issue its decision at any time."). Doc. 27. Given that policy, the motion is **GRANTED**, and

they made no settlement offer after May 24, 2010. Doc. 27 at 2; *see also* doc. 27-1 at 4-5 ("After 5:00 p.m. on May 24, 2010, Plaintiffs made no settlement demands to settle their claims against Hopkins for amounts within policy limits"); doc. 27-2 (deposition of Bordeaux, wherein he agrees that his clients "never offered to settle for policy limits after May 24, 2010"). But Mendakota then extends the "relevancy timeline" until the end of July 2010:

> Because there was some interaction between Mr. Bordeaux and [now former Mendokota claims adjuster] Ms. [Kate] Moulton in June, 2010, regarding the settlement demand and Mendakota's continued efforts to settle the claim, Mendakota agrees that it is appropriate to conduct limited discovery regarding the interactions between Mr. Bordeaux and Ms. Moulton in June *and July* of 2010. However, anything that may have transpired *after July, 2010*, has no relevance whatsoever to Plaintiffs' claim that Mendakota somehow acted in bad faith by allegedly "refusing to settle" with them.

Doc. 27-3 at 5 (emphasis added).

## II. ANALYSIS

An insurer has no affirmative duty to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits. *Baker v. Huff*, 323 Ga. App. 357, 364 (2013).

---

Mendakota's new brief (doc. 27-3), along with its attachments (docs. 27-1 & 27-2), is deemed filed on the same day as Mendakota's motion.

Conversely, insurers *do* have a *Holt* duty to settle in the face of a bona fide, policy-limits settlement offer where it would be unreasonable not to do so. *See supra*, Part I. And from the reasoning contained in cases like *Abueg v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 5503114 at * 3 (D. Nev. Oct. 30, 2014) and *Camacho v. Nationawide Mut. Ins. Co.*, 287 F.R.D. 688, 698 (N.D. Ga. 2012), the dividing line emerges: When settlement negotiations end, so should the temporal scope of the claims file discovery. It is, after all, the very negotiation process itself (hence the negotiations *period*) on which a bad-faith settlement claim focuses, and not what the insurer does once the underlying litigation commences.

Still -- and as the time-frame-creep within Mendakota's own briefing shows -- the actual date of the last settlement missive is not dispositive. The more realistic discovery cut-off is when the relevant parties have, for all intents and purposes, stopped negotiating. Here, Mendakota ultimately says "anything that may have transpired after July, 2010, has no relevance," doc. 27-3 at 6, and this is not disputed. Hence, if it has not produced any non-

privileged, claims-file data generated *before* July 31, 2010, it must do so now.

Plaintiffs want more, however. They also want all attorney-client and work-product privileged materials. Doc. 18 at 10 (all "communications between defense counsel and Mendakota's adjusters regarding Hopkins' defense in the wrongful death action"); *see also id.* at 11 (arguing that, since Hopkins assigned all of his rights to the plaintiffs, they are entitled to his attorney's communications); *id.* at 16-17 (plaintiffs want Mendakota's "claims diary," an adjuster's "final report," and entries regarding Tristan's brother, Dylan); *id.* at 21-23 (they want Mendakota's "Claim Committee Documents").

Mendakota has been shifting its response here. In its initial brief it said that "[n]o documents were withheld from the claim file prior to June 16, 2010, based on the attorney-client privilege or work-product doctrine."[5] Doc. 20 at 12. It otherwise insists that

---

[5] Some courts frown on the invocation of these privileges in this context. *Lender v. GEICO Gen. Ins. Co.*, 2010 WL 3743812 at * 2 (S.D. Fla. Sept. 22, 2010) (discussing Florida law in explaining judicial abolition of the attorney-client privilege as well as work product immunity from discovery in the insurance bad faith context) (citing *Nowak v. Lexington Ins. Co.*, 464 F.Supp.2d 1241 (S.D. Fla. 2006).

A more nuanced approach arises in Georgia law. Where counsel advises both the insurer and the insured jointly, the privilege is waived when the insured (as Hopkins did here) brings a bad-faith claim (directly or, as occurred here, when it is assigned to another). That contrasts with the non-joint-representation context, covering attorney work product and communications to the insurer over *its* coverage duties to its insured. *Compare Camacho v. Nationwide Mut. Ins. Co*, 287 F.R.D. 688, 692 (N.D. Ga. 2012) ("Nationwide cannot claim the protection of the attorney-client privilege over its communications with [defense counsel] regarding the defense of its insured in the underlying action unrelated to the issue of coverage. Such communications are therefore discoverable in this third-party bad faith action, and Nationwide's objection to the production of documents are being protected by the attorney-client privilege is overruled."), quoted in *Woodruff v. Am. Family Mut. Ins. Co.*, 291 F.R.D. 239, 245 (S.D. Ind. 2013); *see also id.* ("This Court finds the *Camacho* analysis persuasive. Even assuming [the insurer] was represented by [counsel], it cannot claim the protection of the attorney-client privilege over its communications with [counsel] regarding the defense of [its insured] in the [underlying action]"), *with Camacho*, 287 F.R.D. at 693 (insurer's communications with its in-house claims counsel involving rendering of legal services in defense of its insured in underlying action were protected by attorney-client privilege, and thus were not discoverable in third-party bad faith action, even though insured had waived attorney-client privilege). Hence, Mendakota must produce all "joint-representation" information, but not any documents or information arising from legal advice solely to Mendakota regarding its coverage responsibility to Hopkins.

The "work product" privilege presents its own complexities. Unless documents in question are shown to be have been produced "in anticipation of litigation," Mendakota cannot even invoke the work-product objection. *See Smith v. Scottsdale Ins. Co.*, 40 F. Supp. 3d 704, 722 (N.D. Va. May 16, 2014) (collecting cases). Often the "front end" of a claims file, typically generated only by adjusters and not lawyers, is *not* work product and thus no privilege applies. It is only when the adjuster, while investigating (adjusting) the claim, suspects the case will be litigated (*e.g.*, he discovers that the insured burned his own home down and now seeks to fraudulently collect on his fire insurance) -- and thus, lawyers will probably get involved -- that the privilege comes into play. At that point, after all, the insurer is anticipating litigation, and the law aims to protect the legal analysis of its adjusters and lawyers. That's why the fact and opinion impressions and observation of both attorneys and non-attorney personnel can be work product. Rule 26(b)(3). Otherwise, a routine claims file will be discoverable. *Atlanta Coca-Cola Bottling Co. v. Transamerica Ins. Co.*, 61 F.R.D. 115, 116-17 (N.D. Ga. 1972) (claims files

these privileges apply. *Id.* But again, its later brief pushes the cut-off date (hence, it will hand over its entire file) to July 31, 2010. Doc. 27-3 at 5 (conceding that "it is appropriate to limit discovery regarding the interactions of Mr. Bordeaux and Ms. Moulton in June and July, 2010."). There it says nothing further about any privileges, so the Court will assume that it is handing over *all* file contents. If not, then the parties are directed to confer,[6] in light of the legal guidance set forth in note 5 *supra*, before returning to this Court for judicial compulsion.

Plaintiffs also claim that, by asking Bordeaux at his deposition about a February 11, 2014 letter written to Hopkins, doc. 27-2 at 8-9, Mendakota "opened the door" to more discovery, and thus pushed back the claims-file, discovery cut-off deadline to

---

were discoverable). Here, all "front end" claims file materials must be disclosed, but only up to July 31, 2010. If Mendakota seeks documents and information within that time frame based on a privilege, it must submit same to this Court for *in camera* review – *after* the parties have conferred on same. *See infra* n. 6 & 8.

[6] Local Rule 26.5(c) reminds attorneys "that Fed.R.Civ.P. 26(c) and 37(a)(2) require a party seeking a protective order or moving to compel discovery to certify that a good faith effort has been made to resolve the dispute before coming to court." "That rule is enforced." *Hernandez v. Hendrix Produce, Inc.*, 2014 WL 953503 at * 1 (S.D.Ga. Mar. 10, 2014). And the conference must be meaningful, consistent with the context and complexity level of each case. *Hernandez v. Hendrix Produce, Inc.*, 297 F.R.D. 538, 540 (S.D. Ga. 2014); *State Farm Mut. Auto. Ins. Co. v. Howard*, 296 F.R.D. 692, 697 (S.D. Ga. 2013).

at least that date. Doc. 25 at 2. Mendakota correctly notes that this argument is baseless, and in any event any "work product" that it may have generated in response to that revelation would be irrelevant to the bad faith claim here (there is *no* dispute that underlying-lawsuit settlement efforts failed long before that date; again, the "bad faith" element of the instant lawsuit goes to those efforts, not post-settlement efforts).

There remains a loose end in this matter. Mendakota never comes out and squarely says by what precise date that it has turned over underlying-claim, settlement-phase documents and information to the plaintiffs -- as noted earlier, its briefs keep shifting on the precise "settlement time frame." Doc. 27-3 at 5. Although Mendakota suggests that it has turned over all requested information through July 31, 2010, there remains some uncertainty about this. Hence, the Court **GRANTS** plaintiffs' motion to compel documents (doc. 18) to the extent that Mendakota must produce all non-privileged documents[7] up to July 31, 2010, and

---

[7] If Mendakota is withholding any "work product" or other privileged documents or information by this point, it must, within 14 days of the date this Order is served, submit them to this Court for an *in camera* determination

**DENIES** the remainder. Because Mendakota represents that it has fully complied with plaintiffs' interrogatories, doc. 20 at 12-14, the Court **DENIES** their motion to compel (doc. 19). Given this result, no Fed. R. Civ. P. 37 sanctions are warranted here (Mendakota seeks them, doc. 20 at 15, and so do plaintiffs, doc. 18 at 24). Finally, and as noted above at n. 4, the Court **GRANTS** Mendakota's wholly unnecessary motion for leave to file its reply brief. Doc. 27.

**SO ORDERED** this _28ᵀʰ_ day of July, 2015.

_____
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**

---

and a brief showing why, in light of the legal parameters set forth in note 5 *supra*, that information (created up to July 31, 2010), should not be disclosed to the plaintiffs.